COURT OF APPEALS OF VIRGINIA

Present:   Judges Kelsey, Petty and Beales
Argued at Chesapeake, Virginia

KAITLIN AIRELE TAYLOR
                                                          OPINION BY
v.        Record No. 2236-09-1                   JUDGE D. ARTHUR KELSEY
                                                          JUNE 28, 2011
COMMONWEALTH OF VIRGINIA

          FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
                          Randall D. Smith, Judge

          James B. Melton for appellant.

          Kathleen Martin, Senior Assistant Attorney General (Kenneth T.
          Cuccinelli, II, Attorney General of Virginia, on brief), for appellee.


          Kaitlin Airele Taylor appeals her conviction for grand larceny.  She does not claim she

was wrongly convicted or innocent of the crime.  Instead, Taylor argues the trial court erred by

not using its "inherent discretion and authority" to acquit her of grand larceny and substitute in

its place a lesser crime of petit larceny.  See Appellant's Br. at 4.  The trial court held it had no

such power.  We agree and affirm.

                                            I.

          A grand jury indicted Taylor for grand larceny.  The evidence at Taylor's bench trial

proved she stole more than $200 of merchandise from a Sears store.  After hearing closing

arguments, the trial court pronounced Taylor guilty of grand larceny.  Taylor's counsel asked if

the court would "entertain a motion at the time of sentencing to find her guilty of a misdemeanor

versus a felony."  App. at 106.  The court did not answer the question directly but stated it would

"hear whatever evidence you have at sentencing."  Id.  Shortly after the trial, the court entered an

order reciting that "[a]t the conclusion of the evidence" presented at trial, the court found Taylor

guilty of grand larceny and continued the case for sentencing.  See Order (May 18, 2009).

At the sentencing hearing, Taylor's counsel made a "motion to reduce this to a misdemeanor." App. at 110-11. Counsel conceded, however, there was "no legal basis" for the motion given that the court had already concluded Taylor was "involved" in the theft and the property stolen "exceeded $200." Id. at 113. Nevertheless, counsel argued, Taylor had assisted law enforcement in another matter. For that reason, counsel said, "we're asking the Court to consider reducing the ultimate charge to a misdemeanor, perhaps even deferring findings for a year's worth of probation and then deciding whether to reduce the charge, and I do believe the Court has the discretion to do that whether or not — the Commonwealth objects or not." Id. at 115. The prosecutor opposed Taylor's motion.

The trial court pointed out the $200 threshold for grand larceny and the court's ability to defer and dismiss criminal charges were "legislative decisions." Id. at 116. Taylor's counsel then suggested the court could "revisit" its earlier factfinding and declare the stolen property's value to be less than $200. Id. The court rejected the suggestion as a pretextual effort to call a "duck a dog." Id. "I would be happy to do that if that was provided for in the law," the trial judge explained, "but I think what I would have to do is create a fiction to go outside, and when the Commonwealth — it is their role in the system to determine the charge, and then it's my role to determine whether the evidence meets the charge. If it didn't, I would have found the defendant not guilty, but I'll have to deny your motion." Id. at 116-17.[1]

---

[1] For our purposes, it is inconsequential that the trial court entered the written conviction order a few days after orally pronouncing Taylor guilty at the conclusion of the trial. "The rendition of a judgment must be distinguished from its entry on the court records. The rendition of a judgment duly pronounced is the judicial act of the court, and the entry or recording of the instrument memorializing the judgment 'does not constitute an integral part of, and should not be confused with, the judgment itself.'" Jefferson v. Commonwealth, 269 Va. 136, 139, 607 S.E.2d 107, 109 (2005) (citation omitted). This point does not contradict the oft-repeated maxim that a court speaks only through its orders, a proposition which "deals with evidence of judicial action, that is, a declaration of historical fact." Id. at 139-40, 607 S.E.2d at 109-10.

II.

On appeal, Taylor argues the court "erred by concluding that it did not have the inherent discretion and authority to find appellant guilty of a misdemeanor *despite* its finding that the value of the stolen property was $200.00 or more." Appellant's Br. at 4 (emphasis added). Put another way, Taylor contends the trial court erred by not using its inherent discretion to acquit her of grand larceny — a crime the evidence proved beyond a reasonable doubt she committed.

We reject Taylor's argument as inconsistent with first principles of judicial power. A Virginia court's authority comes from one of three sources: (i) the express and implied powers invested in the judiciary by the Virginia Constitution; (ii) the inherent common law authority inherited from England at the time of our Commonwealth's founding; and (iii) specific legislative enactments by the General Assembly. None of these sources of power authorized the trial court in this case to acquit Taylor of grand larceny.

A.  THE VIRGINIA CONSTITUTION

Adopted over a decade before the United States Constitution, the 1776 Virginia Declaration of Rights provided that "the legislative and executive powers of the State should be separate and distinct from the judiciary." Va. Decl. of Rights § 5 (1776); see also Va. Const. ¶ 2 (1776). The original principle has endured to this day, ensuring that the legislative, executive, and judicial branches of government "shall be separate and distinct" and that no one branch could "exercise the powers properly belonging to the others." Va. Const. art. III § 1 (1971).

The separate and independent status of the judiciary in the Commonwealth's tripartite system of government implies certain inherent powers "incident to the exercise of judicial power" vested in the courts. 2 A. E. Dick Howard, Commentaries on the Constitution of Virginia 718-20 (1974) (citation omitted). Such powers include, for example, the "authority to discipline attorneys," In re Moseley, 273 Va. 688, 697, 643 S.E.2d 190, 195 (2007), the power of

summary contempt, Robinson v. Commonwealth, 41 Va. App. 137, 145, 583 S.E.2d 60, 64 (2003), and the power to continue a case for a lawful disposition at a later date, Hernandez v. Commonwealth, 281 Va. 222, 226, 707 S.E.2d 273, 275 (2011); Moreau v. Fuller, 276 Va. 127, 137, 661 S.E.2d 841, 846-47 (2008).

But nothing in the separation-of-powers doctrine suggests a court has the inherent power to acquit a defendant of a crime that the evidence proved beyond a reasonable doubt she committed. To be sure, just the opposite is true. The assertion of a power to acquit the guilty rests upon the fallacy "that the power to enforce begets inherently a discretion to permanently refuse to do so." Ex parte United States, 242 U.S. 27, 42 (1916); see also Ex parte United States, 287 U.S. 241, 250 (1932). The asserted power stands in defiance of, not in conformity with, the separation-of-powers doctrine.

As the United States Supreme Court has explained, the constitutional "distribution of powers" is unbalanced when the judiciary relies on "elements of consideration which would be otherwise beyond the scope of judicial authority" under statutes governing matters of crime and punishment. Ex parte United States, 242 U.S. at 42.

> [T]he disregard of the Constitution which would result from sustaining the proposition is made if possible plainer by considering that, if it be that the plain legislative command fixing a specific punishment for crime is subject to be permanently set aside by an implied judicial power upon considerations extraneous to the legality of the conviction, it would seem necessarily to follow that there could be likewise implied a discretionary authority to permanently refuse to try a criminal charge because of the conclusion that a particular act made criminal by law ought not to be treated as criminal. And thus it would come to pass that the possession by the judicial department of power to permanently refuse to enforce a law would result in the destruction of the conceded powers of the other departments and hence leave no law to be enforced.

Id.; see also Sorrells v. United States, 287 U.S. 435, 449-50 (1932); accord The Federalist No. 78 (Alexander Hamilton) ("The courts must declare the sense of the law; and if they should be

disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body.").

For this reason, a court simply has no "authority to free guilty defendants," Sorrells, 287 U.S. at 449, whose guilt was proved in a lawful trial. When a "defendant has been duly indicted for an offense found to be within the statute, and the proper authorities seek to proceed with the prosecution, the court cannot refuse to try the case in the constitutional method because it desires to let the defendant go free." Id. at 450. Such a practice "is inconsistent with the Constitution, since its exercise *in the very nature of things* amounts to a refusal by the judicial power to perform a duty resting upon it and, as a consequence thereof, to an interference with both the legislative and executive authority as fixed by the Constitution." Ex parte United States, 242 U.S. at 50-52 (emphasis added) (declaring unlawful the practice then called "laying the case on file").

We agree with the reasoning of the United States Supreme Court.[2] The Virginia Constitution vests the General Assembly with the final authority to define the elements of a crime and, by negative implication, to identify the host of impermissible judicial "considerations extraneous to the legality of the conviction," id. at 37, which have nothing to do with the defendant's guilt or innocence. Virginia courts have no authority to "evaluate the 'propriety, wisdom, necessity and expediency' of legislation." Laurels of Bon Air, LLC v. Med. Facilities of Am. Living, 51 Va. App. 583, 599, 659 S.E.2d 561, 569 (2008) (citation omitted). Faithful to this tradition of judicial self-restraint, a Virginia court cannot refuse to convict a guilty defendant merely because it questions the category of offense assigned by the legislature, considers the

---

[2] Moreau likewise applied the "division of powers within the federal constitution" to its analysis of "fundamental powers in [the] three branches of government" established by the Constitution of Virginia. Moreau, 276 Va. at 136-37, 661 S.E.2d at 846. See also Taylor v. Worrell Enters., 242 Va. 219, 223, 409 S.E.2d 136, 139 (1991) (relying on a "separation of powers doctrine" that was "succinctly articulated by the United States Supreme Court").

range of statutory punishment too harsh, or believes certain guilty offenders undeserving of a criminal conviction.[3] "Judicial nullification" of a constitutionally valid criminal statute "has, happily, no place in our system." Sorrells, 287 U.S. at 450.

Equally important, the Virginia Constitution vests Commonwealth Attorneys with "the discretion to decide under which of several applicable statutes the charges shall be instituted." In re Horan, 271 Va. 258, 264, 634 S.E.2d 675, 679 (2006) (citation omitted).[4] Absent an unconstitutional abuse of that discretion, Virginia judges have no authority to substitute their judgment for the prosecutor's on such matters. See Boyd v. Cnty. of Henrico, 42 Va. App. 495, 522, 592 S.E.2d 768, 781 (2004) (*en banc*).[5]

The Governor, moreover, has the exclusive constitutional power to "grant reprieves and pardons" after conviction. See Va. Const. art. V § 12. The Virginia judiciary "may not assume a power of clemency or pardon which is a unique function of executive power." Moreau, 276 Va. at 136, 661 S.E.2d at 846; see also Sorrells, 287 U.S. at 449 ("Clemency is the function of the Executive."). The claim that the judiciary shares these powers "lacks historical justification" and seeks to justify an indirect, but effectual, "infringement upon the pardoning power." Note, The Inherent Power of Criminal Courts to Control Their Sentences, 12 Colum. L. Rev. 543, 544 (1912).

---

[3] See, e.g., Lilly v. Commonwealth, 50 Va. App. 173, 184, 647 S.E.2d 517, 522 (2007) ("legislative 'specification of punishments'" are "matters ordinarily understood as 'peculiarly questions of legislative policy'" (citation omitted)); Mouberry v. Commonwealth, 39 Va. App. 576, 585-86, 575 S.E.2d 567, 571 (2003) (holding that concerns about the wisdom and propriety of legislation "can only be resolved by the legislative branch" (citations omitted)).

[4] See also Mason v. Commonwealth, 217 Va. 321, 323, 228 S.E.2d 683, 684 (1976) (recognizing prosecutorial discretion to proceed "under the misdemeanor statute or the felony statute"); Brown v. Commonwealth, 30 Va. App. 243, 250, 516 S.E.2d 678, 682 (1999) (finding prosecution had discretion to charge under applicable misdemeanor or felony statutes).

[5] Here, the prosecutor opposed Taylor's request that the trial court acquit her of grand larceny and consider the evidence only in support of a petit larceny charge. Nothing in our analysis precludes a prosecutor from seeking under Code § 19.2-231 to amend an indictment to assert a lesser-included charge.

## B.  THE COMMON LAW

Taylor also contends our analysis would be incomplete if we failed to consider the common law.  Under common law principles, Taylor argues, a trial court has the discretion to make a "reduction of charges without regard to the facts proven at trial," Appellant's Br. at 9, and, in essence, acquit a defendant of a crime that the evidence proved beyond a reasonable doubt she committed.  We agree with Taylor's opening premise — that we should consult the common law — but find no support for her conclusion that the common law authorized a trial court to acquit a criminal defendant after finding the evidence proved her guilt.

"The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly."  Code § 1-200 (recodifying former Code § 1-10); see Satterwhite v. Commonwealth, 56 Va. App. 557, 560, 695 S.E.2d 555, 556-57 (2010).  This principle is older than the Commonwealth itself.  See W. Hamilton Bryson, Virginia Civil Procedure 47 (3d ed. 1997) (tracing Virginia's adoption of common law to the royal instructions to the Virginia Company which planted the colony at Jamestown).

In Virginia, "our adoption of English common law, and the rights and benefits of all writs in aid of English common law, ends in 1607 upon the establishment of the first permanent English settlement in America, Jamestown."  Commonwealth v. Morris, 281 Va. 70, 82, 705 S.E.2d 503, 508 (2011).  As many courts have noted, Sir William Blackstone's Commentaries on the Laws of England were accepted by the Founders "as the most satisfactory exposition of the common law of England."  Schick v. United States, 195 U.S. 65, 69 (1904).  Nowhere in his four-volume work does Blackstone describe any common law judicial power to acquit the guilty.  To the contrary, the common law does "not permit, that in criminal cases a power should be

lodged in any judge, to construe the law otherwise than according to the letter." 1 William Blackstone, Commentaries *92. When a defendant contends the letter of the law "induces any apparent hardship," Blackstone explained, "the crown has the power to pardon." Id. Under such circumstances, a common law court's only authority was to offer the defendant a temporary "reprieve" of judgment while he sought an executive pardon. 4 Blackstone, Commentaries *394. This limited common law power, the United States Supreme Court has emphasized, cannot be converted "into the existence of an arbitrary judicial power to permanently refuse to enforce the law." Ex parte United States, 242 U.S. at 44.

So strong was this principle that it precluded common law courts from suspending any portion of a criminal sentence absent express statutory authorization:

> The power of courts to suspend sentence, this phrase being frequently employed as meaning either delay in the imposition of a sentence for crime or the staying of execution of the sentence imposed, has been much discussed. *The weight of authority appears to be that, under the common law, courts do not possess the power to delay the imposition or execution of sentences for crime, except temporarily, as for instance, in order to give time for motions for new trial, writs of error, or to determine the precise sentence to be imposed.*

Richardson v. Commonwealth, 131 Va. 802, 808, 109 S.E. 460, 461-62 (1921) (emphasis added) (relying on Ex parte United States, 242 U.S. at 51-52).[6]

If the common law precluded trial courts from suspending a criminal sentence without express statutory authority, then, *a fortiori*, it is inconceivable the common law would nonetheless authorize courts to refuse to convict a criminal defendant (for reasons wholly

---

[6] Also citing Ex parte United States, 242 U.S. 27 (1916), the revisers of the 1919 Code of Virginia "did not believe that such power existed" under the common law. Judge Martin P. Burks, The Code of 1919, Address before the Virginia State Bar Association (May 16, 1919), in 5 Va. L. Reg. (n.s.) 97, 105 (1920). The General Assembly later enacted legislation providing statutory authority for suspension of sentences under certain circumstances. See Code § 19.2-303. So, too, did the United States Congress. See Affronti v. United States, 350 U.S. 79, 80 (1955) (noting Congress enacted the Probation Act in 1925 in response to Ex Parte United States).

unrelated to guilt or innocence) where the defendant's guilt was proved beyond a reasonable doubt. Under English common law, only the crown had the prerogative power of pardon. There simply was no such thing as a judicial pardon. See Ex Parte United States, 242 U.S. at 43-52.[7]

On appeal, Taylor concedes she has no legal authority for asserting common law courts had the power to acquit a guilty defendant. See Oral Argument Audio at 3:20 to 4:13. Undeterred by this admission, however, Taylor contends we should simply declare by *ipse dixit* that the power is within our common law authority. The assumption underlying this request, however, presupposes the common law is not merely a library of discrete legal principles honed over centuries of judicial application — but is instead a metaphor of judicial lawmaking power, one which we may rely upon to enact improvements in the unwritten law or to justify innovations on topics not specifically addressed by statutes.[8] We do not share this view of the common law.

In his 1803 edition of Blackstone's Commentaries, St. George Tucker acknowledged a certain elasticity in the incorporation of English common law into the *corpus* of our law at the time of the 1776 Virginia Constitutional Convention. English common law, Tucker explained, governed Virginians only "so far as the same were applicable to the nature of their situation and circumstances . . . ." 1 St. George Tucker, Blackstone's Commentaries, Editor's App. Note E at 432 (1803). As heirs of this tradition, Virginia jurists are free to trim off or excise altogether those aspects of English common law which "are repugnant to the nature and character of our

---

[7] As Blackstone explained, "it would be impolitic for the power of judging and of pardoning to centre in one and the same person" because, among other things, "it would tend to confound all ideas of right among the mass of the people; as they would find it difficult to tell whether a prisoner were discharged by his innocence or obtained a pardon through favour." 4 Blackstone, Commentaries *397.

[8] Cf. Anthony D'Amato, Legal Realism Explains Nothing, 1 Wash. U. Juris. Rev. 1, 2 (2009) (Historically, "[h]ardly anyone thought that judges made the law or were entitled to make it. Instead, law was believed to be a body of concepts . . . that judges had to study, understand, respect, and apply.").

political system, or which the different and varied circumstances of our country render inapplicable to us," Weishaupt v. Commonwealth, 227 Va. 389, 400, 315 S.E.2d 847, 852 (1984) (citation and emphasis omitted), as those aspects "are either not in force here, or must be so modified in their application as to adapt them to our condition," id.

Unless a common law maxim fails the repugnancy test, Tucker continued, it "remained in full force . . . until repealed, altered, or amended by the *legislative authority* of the colonies, respectively; or by the constitutional acts of the same, when they became sovereign and independent states." 1 Tucker, Blackstone's Commentaries, Editor's App. Note E at 432 (emphasis added). From 1776 until today, Virginia law has recognized this distinction. Unless "repugnant" to the principles of our constitutional republic, English common law governs "except as altered by the General Assembly." Code § 1-200.[9]

Framed from this perspective, simply restating Taylor's request should be sufficient to refute it. She asks us to recognize — for the first time — a common law power of a Virginia court to acquit a criminal defendant whose guilt has been proved beyond a reasonable doubt. Nothing in English common law or, for that matter, the "common law developed in Virginia" after Jamestown, Morris, 281 Va. at 82, 705 S.E.2d at 508-09, authorizes the assertion of such an anomalous judicial power.

## C.  STATUTORY AUTHORITY

In various contexts, the General Assembly has authorized trial courts in Virginia to acquit a defendant of a criminal offense for reasons unrelated to guilt or innocence if certain statutory conditions are met. The General Assembly "is presumed to have known and to have had the

---

[9] See, e.g., Morris, 281 Va. at 81, 705 S.E.2d at 508; Jenkins v. Mehra, 281 Va. 37, 44, 704 S.E.2d 577, 581 (2011); Collins v. Commonwealth, 57 Va. App. 355, 361, 702 S.E.2d 267, 269-70 (2010); Wade v. Commonwealth, 56 Va. App. 689, 693, 696 S.E.2d 258, 260 (2010); Satterwhite, 56 Va. App. at 560, 695 S.E.2d at 556.

- 10 -

common law in mind" when enacting statutes. Jenkins v. Mehra, 281 Va. 37, 44, 704 S.E.2d 577, 581 (2011) (citations and internal quotation marks omitted). The enactment of these statutes demonstrates the General Assembly correctly concluded no common law precedent authorized such extraordinary relief and that, if Virginia courts were to have this power, it must be granted by statute.[10] Because statutes in derogation of the common law must be "strictly construed" and not "enlarged" beyond their "express terms," id. at 45, 704 S.E.2d at 581 (citation omitted), the trial court correctly refused to apply any of these statutes to Taylor's grand larceny charge — a crime none of the statutes specifically address.[11] Thus, the trial court had no statutory authority to grant the relief she requested.

### D. MOREAU & HERNANDEZ

Finally, Taylor argues our reasoning cannot be reconciled with Moreau v. Fuller, 276 Va. 127, 661 S.E.2d 841 (2008), and Hernandez v. Commonwealth, 281 Va. 222, 707 S.E.2d 273 (2011). We disagree.

Neither Moreau nor Hernandez addressed the issue before us. In Moreau, a Commonwealth Attorney sought a mandamus remedy to preclude a district court judge from continuing a case and to compel the judge to issue a final decision. The Virginia Supreme Court denied the relief because continuing a case for purposes of "rendering judgment" involves a

---

[10] Accord United States v. Cannon, 778 F.2d 747, 749 (11th Cir. 1985) ("We are cited to no federal authority, however, and we know of none, which empowers a federal judge to withhold adjudication and impose probation or any other sentence. Whether such authority should exist is a matter within the province of the Congress.").

[11] See, e.g., Code §§ 4.1-305(F) (underage "consumption, purchase or possession" of alcohol); 15.2-1812.2(B) (malicious damage to property); 16.1-278.9(A) (children found delinquent for certain drug and alcohol offenses); 18.2-57.3(A) (assault and battery against a family or household member); 18.2-61(C) (marital rape); 18.2-67.1(C) (marital forcible sodomy); 18.2-67.2(C) (marital object sexual penetration); 18.2-251 (possession of controlled substances or marijuana); and 19.2-303.2 (certain property crimes constituting misdemeanors).

- 11 -

discretionary, not ministerial, act outside the scope of mandamus. Moreau, 276 Va. at 138, 661 S.E.2d at 847.

But "[w]hat may in a proper case be reasonably subject to challenge," Moreau clarified, "is whether the judge may decline to render judgment and continue the case with or without terms akin to probation status with the promise from the court of a particular disposition at a later date." Id. at 137, 661 S.E.2d at 847. "However, the case before us does *not* present such questions," Moreau held, because the record did not show the district court employed this practice. Id. (emphasis added). To further underscore the point, three justices in Moreau emphasized the authority of a trial court to defer and dismiss criminal charges without statutory authority "is the precise question that the Court does not answer today because it is not properly before us. The Court's inability to address this issue should *not* be viewed as a tacit approval of the practice." Moreau, 276 Va. at 140, 661 S.E.2d at 848 (Kinser, J., concurring) (emphasis added).

Hernandez did little more than "revisit" Moreau in "a different factual context." Hernandez, 281 Va. at 223, 707 S.E.2d at 273. Holding only that a trial court had the discretionary authority to continue a case on its docket for a future decision, Hernandez left unresolved the question unaddressed in Moreau. "In Moreau, we left open the question whether a court may defer judgment and continue a case with a *promise* of a particular disposition at a later date. That question was not before the Court in Moreau and *is not before us here*, as neither case involved such a promise." Hernandez, 281 Va. at 225, 707 S.E.2d at 274 (citation omitted and second emphasis added).

If anything, Hernandez supports our reasoning. "We agree with the Court of Appeals' observation in the present case," Hernandez acknowledges, "that once a court has entered a judgment of conviction of a crime, the question of the penalty to be imposed is entirely within

the province of the legislature, and the court has no inherent authority to depart from the range of punishment legislatively prescribed." Id. at 225, 707 S.E.2d at 275. In our case, Taylor's request went beyond merely questioning the penalty and asking the trial court to depart from the range of punishment authorized by statute. Taylor wanted a downward departure in the *charge itself*. If a trial court lacks the inherent authority to reduce a sentence below the statutory range, it likewise has no inherent authority to reduce or dismiss the criminal charge altogether when the evidence proves guilt beyond a reasonable doubt.

In short, Moreau and Hernandez merely hold a trial court has the discretion to continue a case for a future disposition. Neither case addresses what future disposition the court has authority to impose. In other words, neither Moreau nor Hernandez addressed whether the decision ultimately made by the trial court, after the discretionary continuance, could be one acquitting a criminal defendant whose guilt was proved beyond a reasonable doubt. Cf. Ex parte United States, 242 U.S. at 46 (recognizing the inherent power of a court to order a "mere postponement" in the entry of a final order but denying any such power exists as a pretext for granting a criminal defendant "a pardon for his crime" (citation omitted)). Given the limited scope of Moreau and Hernandez, we disagree with Taylor's claim that either case supports her challenge to the trial court's decision in this case.

III.

In sum, the trial court correctly held it had no authority — constitutional, common law, or statutory — to acquit Taylor of grand larceny after finding the evidence proved her guilt beyond a reasonable doubt. We thus affirm her conviction.

Affirmed.