ELDER, J., with whom PETTY, J.,
joins, dissenting.
I have no doubt that the majority is attempting to right what it perceives as a wrong in these cases. However, in order to do so, the majority must either authorize the Attorney General, in his discretion, to consent to the issuance of a writ of actual innocence in cases in which such writs would not otherwise issue or ignore the plain meaning of Code § 19.2-327. Neither is a prudent path to walk, for the personal views of the members of this Court should have no bearing on how this Court applies the law as written by the legislature. “Our province is not to make law, but to administer it, and we must, therefore, decide this case according to the settled law as it is written, and not permit a hard case to make bad law.” Yancey v. Field, 85 Va. 756, 758, 8 S.E. 721, 721 (1889). Therefore, I respectfully dissent.
The issue is a relatively simple one. The statute provides that in order for a writ of actual innocence to issue, material in the record must “prove that no rational trier of fact could have *199 found proof of guilt beyond a reasonable doubt.” Code § 19.2—327.11(A)(vii). Here we have two victims of vicious sexual crimes, each of whom has positively identified Haynes-worth as her attacker. One of the victims spent more than two hours with Haynesworth, went through a rigorous cross-examination at trial, and was believed by the jury. The only real “new” evidence in the record is that two similar crimes which occurred within a month of these offenses were proved to have been committed by another individual who resembled Haynesworth. On the record before us, neither of the victims in these cases has recanted her positive identification of Haynesworth or expressed any doubt about the identity of her attacker. How can this Court conclude under Code § 19.2-327.13 that no “rational trier of fact” could believe these victims’ identifications of Haynesworth simply because DNA evidence establishes two other victims of similar crimes were mistaken and it is possible, as a result, that Haynesworth is innocent?
Despite acknowledging that, even with the new evidence, these cases would be affirmed on direct appeal, the Attorney General has taken the position that the evidence supports the issuance of the writs. Indeed, the Attorney General has conceded that the same person committed all of the relevant crimes. Since it is unquestioned that Haynesworth did not commit the crimes for which he was exonerated based on the DNA evidence, the logical consequence of this concession, if accepted, would be to compel the conclusion that he did not commit the crimes before this Court. However, the Attorney General also observed at oral argument that, but for his concession reflecting his belief that Haynesworth did not commit these offenses, a fact-finder could very well credit the identification testimony of the victims in these cases over the evidence relied upon by Haynesworth. Given this important distinction, the actual innocence statutes simply do not permit issuance of the requested writs. The fact that Haynesworth did not commit other crimes does not prove he did not attack these two victims. The facts in these cases could not be more compelling. The victims have not recanted, no one has con *200 fessed, and there is no direct evidence that Haynesworth did not commit these crimes. The majority, which apparently accepts the Attorney General’s concession without any development of the facts under Code § 19.2-327.12, renders the Attorney General’s concession dispositive to the issuance of the writs.
The only time this Court has considered and accepted an Attorney General’s confession of error in the context of the writ of actual innocence statutes was in Copeland v. Commonwealth, 52 Va.App. 529, 532, 664 S.E.2d 528, 530 (2008), but the facts in that case are in no way analogous to those in these cases. In Copeland, scientific evidence, akin to DNA, established that the item in question was not a “firearm” as required by the statute. 52 Va.App. at 531, 664 S.E.2d at 529. The certificate of analysis and an examination of the weapon in question affirmatively established Copeland’s innocence of the crime charged. In other words, the Attorney General merely conceded the irrefutable.
To the contrary in these cases, there is no direct evidence that exonerates Haynesworth. The Attorney General has merely expressed his opinion that Haynesworth is innocent. Overturning a conviction simply because the Attorney General believes the defendant is innocent judicially empowers him to pardon a convicted criminal, a power he does not have. See Taylor v. Commonwealth, 58 Va.App. 435, 443, 710 S.E.2d 518, 522 (2011) (“The Governor ... has the exclusive constitutional power to ‘grant reprieves and pardons’ after conviction.” (quoting Va. Const. art. V, § 12)). Similarly, granting a writ of actual innocence simply because the Court believes in petitioner’s innocence amounts to a judicial pardon. This Court has previously acknowledged such action is beyond the scope of our power, yet today ignores our responsibility to exercise only judicial powers and instead encroaches on the pardoning power of the Governor of the Commonwealth. See id. at 439, 710 S.E.2d at 521 (explaining that none of the three branches of government can “exercise the powers properly belonging to the others” (quoting Va. Const. art. III, § 1)); see also Copeland, 52 Va.App. at 532, 664 S.E.2d at 530 *201 (cautioning against “imping[ing] upon the Governor’s exclusive power over executive clemency”). Simply put, we do not have the power to do anything other than that mandated by the actual innocence statutes.
Perhaps the legislature should draft the statutes more broadly to allow us the freedom to correct perceived mistakes of the criminal justice system and grant petitions for writ of actual innocence in cases such as these. However, it is our judicial duty to apply statutes as written, not re-write the statutes to achieve an end that we consider more appropriate. I respectfully suggest that the action this Court takes today is inconsistent with our usual exercise of judicial restraint.[1]
I.
BACKGROUND
In 1984, Haynesworth was indicted for completed or attempted sexual assaults committed against five different women. Haynesworth’s petitions for writ of actual innocence involve his August 10, 1984 convictions for rape, sodomy, abduction with intent to defile, and two counts of use of a firearm in the commission of those felonies against M.A. and his October 11, 1984 convictions for attempted robbery, abduction with intent to defile, and two counts of use of a firearm in the commission of those felonies against T.H.

Crimes Against J.S., D.K, and L.D.

[2]

On January 3, 1984, J.S. was raped at her place of employment by a man brandishing a serrated knife. J.S. identified Haynesworth as her attacker from a photo array and positive *202 ly identified Haynesworth at trial in 1984, stating there was no question in her mind that he was the person who raped her. Haynesworth was subsequently convicted of rape. However, on April 2, 2009, an analysis of buccal swabs taken from J.S. and Haynesworth during the initial investigation eliminated Haynesworth as a contributor of the foreign biological material found within J.S. The certificate of analysis further established that another individual, Leon W. Davis, could not be eliminated as a contributor.[3] Based on this biological evidence, the Supreme Court granted Haynesworth’s writ of actual innocence and vacated his conviction for the rape of J.S. See In re Haynesworth, No. 090942 (Va. Sept. 18, 2009).
On January 21, 1984, D.K. was robbed and orally sodomized at knifepoint. Haynesworth was charged with these offenses, but a jury acquitted him. Even though Haynesworth was acquitted of these offenses, the Commonwealth joined Haynes-worth’s 2009 request for post-conviction DNA testing to determine whether Leon Davis may have also committed the other crimes with which Haynesworth was charged. Once again, the analysis eliminated Haynesworth as a contributor of the DNA evidence in the offenses involving D.K. but did not eliminate Davis.
Haynesworth was also indicted for the attempted robbery of L.D. The trial court entered a nolle prosequi, and Haynes-worth was not convicted of that crime.
January 30, 1984 Crimes Against M.A. in Henrico County— Convicted
At about 8:30 p.m. on January 30, 1984, M.A. was rounding the corner of an apartment building when she encountered a man who repeatedly asked her for the time. M.A. first ignored his requests, and then tried to separate herself from him. However, the man then “suggested” that she stop and turn around slowly because he had a gun pointed at her. *203 Seeing the gun, M.A. complied with the assailant’s demand to walk toward him. The assailant then ordered her to go behind an air conditioning unit and forced her to perform oral sex upon him.
The gunman told M.A. they would have to move to a more secluded location. Holding the gun on M.A., he told her to “act like his girlfriend,” and walked her up the street with his arm around her. The assailant engaged M.A. in conversation regarding her age, where she lived, where she went to school, and other things. The assailant told M.A. he was nineteen and his birthday was in June. He said that it was not the first time he had done this and would not be the last, and that he usually used a knife rather than a gun. The gunman walked M.A. into some woods. The assailant had M.A. perform oral sex upon him a second time and then raped her. After unsuccessfully trying to have anal intercourse with her, the gunman had M.A. perform oral sex a third time and then walked M.A. out of the woods.
The assailant gave M.A. some gloves to wear because it was cold and asked her to be his girlfriend. M.A. testified that she agreed and gave him her telephone number because she did not want to make him angry. He walked with her toward a nearby bar, kissed her, promised to call her, and left. When M.A. reached the bar, she immediately reported that she had been attacked and raped and later took the police to the location in the woods where the rape occurred. M.A. testified that the entire ordeal lasted approximately two hours.
M.A. testified that the assailant called her the following morning and asked her to meet him later that afternoon. M.A. agreed and went to the agreed-upon location, accompanied by undercover officers, but the assailant did not appear.
M.A. identified Haynesworth as her attacker from a photo array and positively identified Haynesworth at trial. M.A. also testified that she noticed the assailant’s firearm was silver. When shown a picture of a toy gun found in Haynes-worth’s bedroom after his arrest, M.A. confirmed that the toy gun looked like the gun her attacker used in the commission of *204 her rape. During cross-examination, defense counsel attempted to impeach M.A.’s testimony using prior statements to the police and her potential bias for lying about the alleged crimes. Further, defense counsel affirmatively questioned M.A.’s account of the perpetrator’s height and had Haynes-worth stand near M.A. in order to discount her identification of Haynesworth as her assailant.[4] Notwithstanding the lengthy cross-examination, M.A. testified she had “no doubt” that Haynesworth was the perpetrator. A certificate of analysis in the case indicated semen found in M.A.’s body and underpants was consistent with a blood “type O secretor.” Haynesworth is a “type O secretor.”
A jury convicted Haynesworth of rape, sodomy, abduction with intent to defile, and two counts of use of a firearm in the commission of those felonies and sentenced him to a total of thirty-six years’ imprisonment.[5]

February 1, 1984 crimes against T.H. in Richmond—Convicted

At approximately 6:30 a.m. on February 1, 1984, T.H. was preparing to leave for work when she was confronted by a man with a gun beside the open car door. He demanded T.H.’s pocketbook, but she said she had no money. T.H. and the attacker talked near the vehicle for about ten minutes, during which the attacker threatened to rob or sodomize T.H. When asked if anyone lived with her, T.H. lied and told the assailant she lived alone.
The perpetrator ordered T.H. to enter her home. With the gun at her back, T.H. returned to her home and unlocked the door with the gunman following her inside. When T.H. told him that her grandmother lived with her, he said he would “take care” of the grandmother if she awakened. As T.H. *205 complied with the assailant’s order to turn off the light, she heard her dog jump to the floor in a bedroom down the hallway, and heard her grandmother moving about. T.H. stepped into the hallway as the dog rushed past her toward the perpetrator. T.H. yelled to her grandmother, and the attacker fled from the house.
T.H. called the police immediately. T.H. gave a description of the attacker to the police and indicated he was about five feet ten inches in height. On three different occasions the police showed her separate arrays of photographs of possible suspects. T.H. did not pick any photographs out of the first two arrays. On the third occasion T.H. immediately selected Haynesworth’s photograph when she saw it. T.H. identified Haynesworth in court as the person who had accosted her on the morning of February 1, 1984.

Newly-Discovered Evidence

The foundation of Haynesworth’s petitions for writ of actual innocence is his claim that Leon Davis is the actual perpetrator of the crimes against M.A. and T.H. and that each of these women misidentified Haynesworth as her assailant. To support this claim, Haynesworth has introduced DNA evidence that eliminated him as a contributor of the biological evidence in the cases involving J.S. and D.K. Because J.S. and D.K. had each positively identified Haynesworth as her assailant, Haynesworth posits this evidence “conclusively establishes that [these] two victims of similar attacks[, M.A. and T.H.,] misidentified Haynesworth as their assailant.” This evidence allegedly affects the convictions subject to the instant petitions for writ of actual innocence because the challenged convictions “share many idiosyncratic features” with the other rapes now conclusively determined by DNA evidence to have been committed by Davis. Haynesworth further points to the-physical similarities between Haynesworth and Davis to support his position that M.A. and T.H. each misidentified Haynesworth as her assailant. From the combined weight of these new pieces of evidence and the inferences resulting therefrom, Haynesworth argues that had this evidence been before the *206 jury at each of Haynesworth’s original trials, no reasonable juror would have convicted him. The Attorney General further avers that “Davis is the actual perpetrator of the crimes against M.A. and T.H.”
II.
ANALYSIS
The Supreme Court has expressly instructed that the statutes governing writs of actual innocence provide “relief [to] only ... those individuals who can establish that they did not, as a matter of fact, commit the crimes for which they were convicted.” Carpitcher v. Commonwealth, 273 Va. 335, 345, 641 S.E.2d 486, 492 (2007). Our statutory authority to grant a writ of actual innocence is “an exceedingly narrow exception to Virginia’s twenty-one-day rule.” Turner v. Commonwealth, 56 Va.App. 391, 444, 694 S.E.2d 251, 278 (2010) (en banc) (Petty, J., concurring, joined by Kelsey & Haley, JJ.), aff'd, 282 Va. 227, 717 S.E.2d 111 (2011).
The more specific standard provides that a petitioner seeking a writ of actual innocence must prove the newly-discovered evidence:
1) “was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction became final in the circuit court;” Code § 19.2-327.11(A)(iv),
2) “is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction by the court;” Code § 19.2-327.11(A)(vi),
3) “is material and when considered with all of the other evidence in the current record, will prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt;” Code § 19.2-327.11(A)(vii), and
4) “is not merely cumulative, corroborative or collateral.” Code § 19.2-327.11(A)(viii).
Turner, 282 Va. at 239-40, 717 S.E.2d at 117 (quoting Carpitcher, 273 Va. at 343-44, 641 S.E.2d at 491).
*207 Key to the resolution of the issue in these cases is the third prong “requir[ing] that the newly-discovered evidence be ‘material and[,] when considered with all of the other evidence in the current record, will prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt.’ ” Id. at 240, 717 S.E.2d at 123 (quoting Code § 19.2-327.11(A)(vii) (emphases added)). A petitioner must meet this standard by clear and convincing evidence, see Code § 19.2-327.13, defined as that degree of proof “which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established,” Smith v. Commonwealth, 280 Va. 178, 185, 694 S.E.2d 578, 581 (2010).
Code § 19.2-327.11(A)(vii) requires this Court to view the newly-discovered evidence—if determined to be true, see Carpitcher, 273 Va. at 345, 641 S.E.2d at 492 (equating the materiality requirement of Code § 19.2-327.11(A)(vii) with “evidence [that] must be true”)—in the context of the entire record and discard any previously-existing evidence that directly conflicts with those findings. If the remaining evidence is still legally sufficient to sustain the challenged convictions, then the petitioner has failed to produce clear and convincing evidence that “no rational trier of fact could have found proof of guilt beyond a reasonable doubt.” Code § 19.2-827.11(A)(vii); see, e.g., Moore v. Commonwealth, 53 Va.App. 334, 347, 671 S.E.2d 429, 435-36 (2009) (dismissing petitioner’s writ despite the victim’s recantation because “strong corroborating evidence” existed, “including the testimony of [an eyewitness], who saw petitioner and the victim engaged in sexual activity, [and] the victim’s mother’s testimony that petitioner told her he had sex with the victim”).
An independent examination of all of the evidence in the record demonstrates the fatal flaw in Haynesworth’s petitions: The fact that the DNA evidence proved that Haynesworth did not commit other rapes does not, as a matter of law, prove he did not commit these two crimes.[6] Sufficient evidence still *208 exists in the record to support his convictions, namely the identification of Haynesworth by both victims. Our jurisprudence is replete with recognition of the bedrock principle that a verdict can be based entirely on the testimony of one witness whom the trier of fact believes above all others. See, e.g., Nobrega v. Commonwealth, 271 Va. 508, 519, 628 S.E.2d 922, 927 (2006) (“[T]he victim’s testimony alone, if not inherently incredible, is sufficient to support a conviction for rape.”).
The factors for determining the reliability of identification testimony include
the opportunity of the witness to view the criminal at the time of the crime, the witness’ degree of attention, the accuracy of the witness’ prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972).
Haynesworth has not provided any evidence that either victim now believes her identification was inaccurate. After viewing and rejecting the photographs of suspects in two photo arrays, T.H. and M.A. each selected Haynesworth’s photograph and positively identified him as her assailant within about a week after the crimes occurred. Haynes-worth’s trials for the incidents, during which the victims again identified him, took place within about eight months of the crimes. T.H. and M.A. both expressed certainty regarding the identification. T.H. testified that she had a fifteen-minute encounter with Haynesworth, first near her car where they *209 discussed various subjects, then inside her residence. M.A. testified that she spent about two hours with Haynesworth while he held her at gunpoint, repeatedly sodomized and raped her, and engaged her in a lengthy personal discussion.[7]
Further, M.A. was subjected to a rigorous cross-examination during the 1984 trial in which defense counsel challenged the accuracy of M.A.’s identification of Haynesworth before the jury. Despite significant attempts by defense counsel to undermine her credibility, M.A. remained steadfast in her testimony that Haynesworth was her assailant. In other words, M.A.’s credibility was squarely before the jury, which recognized the inconsistencies known at that time and resolved them in the prosecution’s favor. See Barker v. Commonwealth, 280 Va. 370, 373, 337 S.E.2d 729, 732 (1985) (“[T]he credibility of witnesses and the weight to be given their testimony are questions exclusively within the province of a jury.”); Wilson v. Commonwealth, 31 Va.App. 495, 508, 525 S.E.2d 1, 7 (2000). Absent direct evidence that conclusively proves the juries were wrong in choosing to believe M.A. and T.H., we cannot divine the impact additional circumstantial evidence may have on a juror’s assessment of reliability.
Despite the ongoing existence of evidence in the record from which a rational trier of fact could find proof of guilt beyond a reasonable doubt for the offenses against M.A. and T.H., the majority has determined the writs should issue. In doing so, it fails to give full consideration to all the facts in these cases and manifestly relies far too heavily on the Commonwealth’s concession of error. Such a priori acceptance of the Attorney General’s concession is in direct contravention of the role assigned to this Court by the General Assembly. See Copeland, 52 Va.App. at 532, 664 S.E.2d at 530 (instructing this Court to “independently examine[ ] the record presented to us” prior to “accepting] the Attorney General’s concession *210 without ‘further development of the facts’” (quoting Code § 19.2-327.12)); cf. Conkling v. Commonwealth, 45 Va.App. 518, 524, 612 S.E.2d 235, 239 (2005) (noting opinions of the Attorney General are “clearly not binding” on the courts).
III.
CONCLUSION
Application of Virginia’s existing statutory scheme to the evidence in the record categorically prohibits us from concluding the requested writs of actual innocence should issue. Eyewitness testimony from M.A. and T.H. affirmatively identifying Haynesworth as the perpetrator of the remaining two sets of crimes committed against them stands uncontradicted in the record before us. The fact that the Commonwealth now believes Haynesworth is innocent of all the crimes and avers it would not have identified or prosecuted him for the crimes against T.H. and M.A. if it had, at that time, possessed the DNA evidence exonerating him of the crimes against J.S. and D.K., simply is not a dispositive factor under the very narrow statutory scheme we are required to apply. Although this may seem to be a compelling case requiring us to correct an injustice, unless and until the legislature gives us the tools to correct such perceived errors resulting from an otherwise proper application of the judicial process, we are powerless to act.[8]
When we decide cases for extra-judicial reasons, we risk doing damage to the law in ways we never intended.
Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in *211 shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend.
N. Sec. Co. v. United States, 193 U.S. 197, 400-01, 24 S.Ct. 436, 487, 48 L.Ed. 679, 726 (1903) (Holmes, J., dissenting).
Therefore, I respectfully dissent.

. See, e.g., Johnson v. Commonwealth, 58 Va.App. 625, 641, 712 S.E.2d 751, 759 (2011); Lilly v. Commonwealth, 50 Va.App. 173, 181, 647 S.E.2d 517, 521 (2007); see also McGhee v. Commonwealth, 280 Va. 620, 626 n. 4, 701 S.E.2d 58, 61 n. 4 (2010).

. Although the majority claims to have considered, inter alia, "the records of these cases,” the order contains no recitation of the facts. Because I believe the sequence of events and some of the key facts related to those events are critical to the question of whether the writs should issue, I find it necessary to detail those facts here.

. The certificate of analysis stated the "probability of randomly selecting an unrelated individual with a- DNA profile matching the foreign DNA profile ... is 1 in greater than 6.5 billion” or "approximately the world population.”

. M.A. testified, and confirmed on cross-examination, that her assailant was approximately her height of five feet eight and one-half inches or slightly taller. The record establishes that Haynesworth is five feet six inches tall.

. The biological evidence gathered during M.A.'s medical examination was subsequently destroyed on May 24, 1988.

. Indeed, this is not a case in which the victims have recanted their testimony, e.g., Carpitcher, 273 Va. at 341, 641 S.E.2d at 489 (consider *208 ing the recantation of the victim "that her trial testimony was not true”); the alleged true assailant has confessed to the crimes, e.g., Turner, 56 Va.App. at 396-97, 694 S.E.2d at 254 (considering the confession of petitioner's co-defendant "that he alone killed [the victim]”); or concrete facts prove Haynesworth did not commit these two crimes, e.g., Copeland, 52 Va.App. at 531, 664 S.E.2d at 529 (considering a certificate of analysis containing "factual findings ... [which] excluded the item tested from the statutory definition of 'firearm' ” to vacate the petitioner's conviction for possession of a firearm as a convicted felon).

. Moreover, M.A.’s identification testimony was corroborated by other evidence in the record. M.A. testified that a toy gun found in Haynes-worth’s room resembled the weapon her assailant had used. The physical evidence found on her body after the crimes was consistent with Haynesworth's blood type.

. This is not to say that Haynesworth does not have an avenue to seek exoneration. The "traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency.” Herrera v. Collins, 506 U.S. 390, 417, 113 S.Ct. 853, 869, 122 L.Ed.2d 203, 227 (1993). In fact, the Governor has previously ordered Haynesworth's release from prison based on this evidence. I see no reason he would look with disfavor on a pardon request joined in by the Attorney General and the two prosecuting Commonwealth’s Attorneys.